A 1

SCANNED
DATE: 12/10/04
BY: M.P.

## UNITED STATES DISTRICT COURT

_____
| )
JOHN J. HOGAN, | )
     **Plaintiff** | )
| )
vs. | )     **CIVIL ACTION NO. 04-10313JLA**
| )
| )
**KEYSPAN HOME ENERGY SERVICES** | )
**(NEW ENGLAND), INC. a/k/a** | )
**SERVICEDGE PARTNERS, INC.** | )
     **Defendant** | )
_____ | )

## <u>AFFIDAVIT OF KEVIN CADDELL</u>

I, Kevin Caddell, do attest and swear that the following is true and correct to the best of my knowledge, information and belief.

1.     I am employed as the Director of Operations at KeySpan Home Energy Services (New England), LLC ("KeySpan") and I have been so employed since January 1, 1998. In that capacity, I am responsible for the overall field operations of the business, including workforce management and discipline. I am also involved in negotiations of our collective bargaining and the processing of grievances under that agreement.

2.     I am familiar with John J. Hogan, the plaintiff in the above-referenced matter. Mr. Hogan worked as an Energy Services Technician ("EST") for KeySpan from March 16, 1998 to December 5, 2001, when he was discharged. He was a member of United Steelworkers of America, AFL-CIO-CLC Local 9432 (the "Union"). KeySpan regularly deducted Union dues from Mr. Hogan's pay. Mr. Hogan was at all relevant times employed in a Union bargained-for position.

3.      KeySpan sells, installs, and services a variety of home appliances including heating equipment, central air conditioning systems, indoor air quality systems, gas fireplaces, and water heaters.

4.      The Union is the sole and exclusive bargaining representative for all the Union's membership that are employed by KeySpan.

5.      KeySpan and the Union entered into a collective bargaining agreement governing the working conditions of the Union's membership for the period March 1, 2001 through February 29, 2004.  A true and accurate copy of that collective bargaining agreement is attached hereto as Exhibit 1.

6.      On or about March 27, 2001, KeySpan received information that Mr. Hogan had referred a customer to a KeySpan competitor (Heating Pro) to replace a furnace.  KeySpan conducted an investigation and determined that this information was correct.

7.      On or about April 25, 2001, KeySpan terminated Mr. Hogan's employment with KeySpan.

8.      Article IX of the collective bargaining agreement between KeySpan and the Union (Ex. 1) provides for a mandatory grievance and arbitration procedure to resolve any disputes arising under the agreement, including disputes relative to employee discipline or terminations.

9.      On the same date as Mr. Hogan's termination (April 25, 2001), the Union filed a grievance.  A copy of the Grievance Report is attached as Exhibit 2.

10.     On May 4, 2001, a first-step grievance was held.

11.     On June 18, 2001, the Union's grievance of Mr. Hogan's termination was resolved by a "Last Chance Agreement," which is attached as Exhibit 3. The Last Chance Agreement was signed by representatives of the Union and KeySpan, and by Mr. Hogan.

12.     Under the Last Chance Agreement, the Union and KeySpan reached an agreement to reduce Mr. Hogan's discipline from a discharge to a 46-day suspension "for directly referring installation work to a competitor of the Company."

13.     In the absence of a Last Chance Agreement, the collective bargaining agreement would otherwise permit the Union to grieve and arbitrate whether a given work-rule infraction, if committed by an employee, provided just cause to terminate an employee.

14.     But the Last Chance Agreement provides, among other things, that in the future if Mr. Hogan were "found to be using his contacts with customers for personal gain or the gain of others" he would be subject to discharge, and that "such discharge will not be subject to the grievance and arbitration procedure as outlined in Article IX of the parties collective bargaining agreement." Thus, if Mr. Hogan were to be found to have engaged in the forbidden behavior the Union could not challenge the appropriateness of the discipline.

15.     On or about November 15, 2001, KeySpan received information from a KeySpan customer that Mr. Hogan had referred her to another contractor, Heating Pro, to have her furnace replaced.

16.     As a result of this information KeySpan conducted its own investigation of this matter. On November 28, 2001 KeySpan held an investigatory meeting with Mr. Hogan and the Union. Over the following few days, I had several conversations with representatives of the Union regarding the possible resolution of the Hogan matter.

17.    Eventually, on December 4, 2001, I advised the Union that the Company had decided to terminate Mr. Hogan's employment.

18.    On December 7, 2001, I sent by certified mail a termination letter (dated December 5) to Mr. Hogan, with a copy to the Union. A copy of that letter is attached as Exhibit 4.

19.    On December 6, 2001, I received a phone call from Mr. Hogan's counsel, Mr. Zanello, indicating that he would be representing Mr. Hogan in this matter.

20.    The Union has not filed a grievance or sought to arbitrate the circumstances underlying Mr. Hogan's discharge.


Signed under the pains and penalties of perjury.


_____12/8/04_____          _Kevin Caddell_____
Date                       Kevin Caddell


CERTIFICATE OF SERVICE

    I, Thomas R. Teehan, hereby certify that a true copy of the above document, Affidavit of Kevin Caddell, was served upon Robert J. Zanello, Esq., 400 Granite Ave., Milton, MA  02186 by hand on December 9, 2004.

                          _Thomas R. Teehan_____
                          Thomas R. Teehan

4

**Exhibit 1**



# UNITED STEELWORKERS OF AMERICA

DISTRICT NO 4 : — : AFL-CIO-CLC

100 MEDWAY ROAD (SUITE #403)
MILFORD, MA 01757
PHONE: (508) 482-5555    FAX: (508) 482-9343



LOUIS J. THOMAS
DIRECTOR, DISTRICT 4
NORTHEASTERN UNITED STATES

ALBERT H. POLK
SUBDISTRICT DIRECTOR

November 14, 2001

Keyspan Home Energy Services, NE
Francis Coleman, President
62 Second Ave.
Burlington, MA  01803

Dear Mr. Coleman:

Enclosed please find one (1) fully signed copy of the new collective bargaining agreement dated **March 1, 2001-February 29, 2004** recently completed between **Key Span Home Energy Services, NE (Formerly ServiceEdge Partners)** and the United Steelworkers of America on behalf of **Local Union 9432**

Sincerely,

Stephen J. Finnigan
Staff Representative

SJF/msf

Enclosure

# INDEX

## Key Span Home Energy Services (New England)
### And
### United Steelworkers of America, AFL-CIO-CLC

**ARTICLE**

**PAGE**

| | | |
|---|---|---|
| I | Purpose | 1 |
| II | Union Security | 1 |
| III | Dues Deduction | 2 |
| IV | Management Rights | 2 |
| V | Strikes and Lockouts | 3 |
| VI | Benefits | 4 |

Section 1.   Holidays ............................................ 4
Section 2.   Vacation ............................................ 4
Section 3.   Illness Pay ......................................... 4
Section 4.   Health Care and Dental ...................... 5
Section 5.   Life Insurance ................................... 6
Section 6.   Employee Stock Purchase Plan .......... 6
Section 7.   401(k) Savings Plan .......................... 6
Section 8.   Bereavement ..................................... 7
Section 9.   Jury Duty .......................................... 7
Section 10. Tuition Reimbursement ...................... 7

| | | |
|---|---|---|
| VII | Seniority, Layoff and Recall | 8 |

Section 1.   Seniority ........................................... 8
Section 2.   Layoff and Recall .............................. 8

| | | |
|---|---|---|
| VIII | Rates of Pay, Work Week and Call Out | 9 |

Section 1.   Rates of Pay .................................... 10
Section 2.   Work Week and Call Out .................. 10

| | | |
|---|---|---|
| IX | Dispute Procedure | 11 |
| X | Miscellaneous | 12 |
| XI | Succession Language | 13 |
| XII | Changes in Jobs | 14 |
| XIII | Safety Committee | 15 |
| XIV | Duration of Agreement | 15 |
| | | 16 |

## PREAMBLE

Agreement made and entered into this 1st day of March 2001 by and between KeySpan Home Energy Services New England (hereinafter called the "Company") and the United Steelworkers of America, AFL-CIO-CLC, for and in behalf of its Local Union #9432, United Steelworkers of America, AFL-CIO-CLC (hereinafter called the "Union").

# ARTICLE I

## PURPOSE

The intent and purpose of this Agreement is to establish harmonious relationships between the Company and its employees who are represented by the Union.  This Agreement is designed to clarify certain rights and privileges of the parties together with certain working and operating conditions, to establish amicable processes, and to further the principles and processes of collective bargaining.  Both parties agree that excellence is expected in the quality and quantity of work done by every employee in every function, both for our customers and for our fellow employees.

The Union agrees that its members will individually and collectively cooperate with the Company and support its efforts to assure each of its members strives to perform with excellence and to ensure reliable quality services. The Company agrees that it will cooperate with the Union in its efforts to promote harmony and efficiency among employees and the Company.

# ARTICLE II

## UNION SECURITY

The Company recognizes the Union as the exclusive representative for the purposes of collective bargaining with respect to wages, hours and other items and conditions of employment for all full time employees in the classifications of Energy Services Technician, Energy Services Installation Technician and Energy Services Assistant, excluding supervisors and all other employees.  The parties do not intend by this Article to guarantee employment or preservation of work.

It shall be required as a condition of employment that all employees subject to this Agreement who are employed less than thirty (30) days before the effective date of this Agreement

1

and all individuals who are hereafter employed by the Company shall become members of the Union upon completion of thirty (30) days of employment and shall continue as members thereafter.

# ARTICLE III

## DUES DEDUCTION

The Company shall deduct from wages and remit to UNITED STEELWORKERS OF AMERICA, 5 Gateway Center, Pittsburgh, Pennsylvania the membership dues and initiation fees of each employee on whose account such deductions are to be made, pursuant to a written assignment on a form approved by the COMPANY. Membership dues shall be as designated by the International Secretary/Treasurer and certified by the UNION to the COMPANY. Such form shall contain such provisions concerning irrevocability, duration, revocation and automatic renewal as the UNION may request but only to the extent that such provisions comply with the applicable requirements of Section 302(C) of the Labor Management Relations Act, 1947, as now or hereafter amended, as said requirements may from time to time be interpreted by appropriate governmental authorities.

The Union shall indemnify and save the Company harmless against any and all claims, including legal fees, which may arise out of or come into being by reason of any action taken or not taken by the Company for the purpose of complying with this dues deduction provision.

# ARTICLE IV

## MANAGEMENT RIGHTS

(a)    The management of the Company and the direction of the working force are vested solely and exclusively in the Company and shall not in any way be abridged, except as specific restrictions are set forth in this Agreement.

2

(b)    The parties agree that the Company has the right to supervise employees, to hire employees, to promote employees, to discipline, suspend or discharge employees for just cause, to lay off employees, to transfer employees, to subcontract for business reasons, to assign employees, to determine their work locations, to relocate employees, to determine services which employees shall perform, to direct, instruct and control employees, including, but not limited to, the determination of the number and qualification of employees to perform work, the quality of work standards, and the required employee performance to meet such standards, to assign overtime, to determine job content, to combine and/or eliminate jobs, to determine hours of work, to determine types of equipment, methods and procedures to be employed, to make and enforce reasonable rules to assure orderly and effective work, and to perform all other functions in the administration, management, control and/or direction of the business.

(c)    The foregoing enunciation of specific rights retained by the Company is not intended to be a waiver of any rights of the Company not listed unless specifically surrendered in this Agreement, whether or not such rights have been exercised by the Company in the past.

(d)    The Company agrees that it will not contract out bargaining unit work if it will directly cause a layoff of bargaining unit employees.

# ARTICLE V

## STRIKES AND LOCKOUTS

During the term of this Agreement, the Company agrees that there shall be no lockouts and the Union agrees that there shall be no strikes, work stoppages or other interference with normal or efficient work operations by employees covered under this Agreement.

3

# ARTICLE VI

## BENEFITS

**Section 1.    Holidays**

All active employees will be paid a days pay at straight time on the celebration day for New

Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day.  In

addition to the above, employees will be granted four (4) floating holidays to be scheduled by mutual

agreement with the employee's immediate supervisor.  Employees who work during a holiday

celebration shall be paid one and one-half (1 ½) times their straight time rate for the first eight (8)

hours worked in addition to the holiday pay.  Employees who work more than eight (8) hours during

a scheduled holiday will be paid at an overtime rate equal to two (2) times their regular rate of pay

for all hours exceeding eight (8) hours.

Should the celebration day of a holiday fall on a day the employee is not scheduled to work,

the employee shall be paid an additional days pay or be granted a day off, at the employee's option,

to be scheduled with supervisory approval.

For purposes of this section, active employees are all employees with seniority except those

who are on layoff.

**Section 2.    Vacation**

All active employees shall be entitled to the following calendar year vacation time based on

the number of consecutive years of actual work:

| Years Service | Vacation Time |
|---|---|
| 6 months to less than 1 year | 1 week |
| 1 year to less than 5 years | 2 weeks |
| 5 years to less than 10 years | 3 weeks |
| 10 years to less than 20 years | 4 weeks |
| 20 years (beginning in 2002) | 5 weeks |

4

Scheduling of vacation time will be with supervisor approval and based on classification seniority.

Single day vacations will be scheduled based upon department, by zone and then departmental seniority.

For purposes of this section, active employees are all employees with seniority except those who are on layoff.

**Section 3.    Illness Pay**

All active employees shall be entitled to five (5) days sick pay per calendar year.  Any absence resulting from non-occupational accident or sickness which extends beyond five (5) consecutive days will be covered under a short term disability plan, subject to the terms and conditions of the plan, which will provide a weekly benefit of 60% of the employee's straight time rate for forty (40) hours and will extend for a maximum of twenty-six (26) weeks.

All active employees are eligible for long-term disability coverage, subject to the terms and conditions of the plan, which will provide a weekly benefit of 60% of the employee's straight time rate for forty (40) hours.

Employees who have a minimum of three (3) unused sick days at year-end will receive a cash reward in the form of an American Express gift certificate or similar certificate of equal cash value in recognition of their sick time attendance record.  The value of the reward will be calculated based upon the following formula:

| Unused Sick Days | Cash Award |
| --- | --- |
| 5 | $300 |
| 4 | $250 |
| 3 | $200 |

For purposes of this section, active employees are all employees with seniority except those who are on layoff.

**Section 4.       Health Care and Dental**

All active employees with three (3) or more months of service and their eligible family members will be eligible for the Tufts Insurance Program. Employee contribution will be based on 10% of the actual premium.

All active employees with three (3) or more months of service and their eligible family members will be eligible for the Delta Dental Program. Effective March 2, 2001, lifetime orthodontia coverage for eligible dependents will increase to one thousand dollars ($1,000). Effective February 28, 2003 lifetime orthodontia coverage for eligible dependents will increase to one thousand five hundred dollars ($1,500).

For purposes of this section, active employees are all employees with seniority except those who are on layoff.

The Company reserves the rights to provide equal benefits under another plan for the above programs if it so desires.

**Section 5.       Life Insurance**

All active employees with three (3) or more months of service are eligible for life insurance in the amount of sixty thousand dollars ($60,000) and are also eligible for Accidental Death and Dismemberment insurance in the amount of sixty thousand dollars ($60,000).

For purposes of this section, active employees are all employees with seniority except those who are on layoff.

Employees will have the option to purchase dependent and supplemental life insurance coverage and supplemental Accidental Death and Dismemberment insurance coverage at group rates.

**Section 6.       Employee Stock Purchase Plan**

All active employees will be eligible to participate in the KeySpan Employee Stock Purchase Plan after one (1) year of continuous service.

**Section 7.    401(k) Savings Plan**

All active employees will be eligible to participate immediately in the KeySpan Retirement

Savings Plan.  After one (1) year of continuous service, the Company will provide a fifty-cent ($.50)

match on each $1.00 the employee contributes to the Plan up to a maximum employee contribution

of 6%.

**Section 8.    Bereavement**

Any active employee shall receive up to three (3) consecutive working days off with pay,

ending with the day of or the day after the funeral, when death occurs in his immediate family, for

the purpose of attending to the details of the funeral and attending the funeral.  Such days off are to

be taken during the period from the day of death to the day after the funeral, inclusive.  Immediate

family shall be defined as husband, wife, son, daughter, stepchild, mother, father, mother-in-law,

father-in-law, sister, brother, grandparent, grandchild, and step-parent.  Compensation for time off

under the terms of this Article shall be eight (8) hours per day, except for those employees

scheduled to work a four (4) day per week, ten (10) hour work day, in which case, compensation will

be ten (10) hours, calculated at the employee's regular straight-time rate.  At the discretion of

management, additional time may be allowed based on individual circumstances.

Active employees shall receive one (1) working day off with pay to attend the funeral of their

aunt or uncle.

**Section 9.    Jury Duty**

Any active employee required to miss work to serve on a jury shall be paid the difference

between any jury duty pay he receives and what regular straight-time pay (based on either an 8-hour

day or an 10-hour day for those employees scheduled to work a four (4) day per week, ten (10) hour

work day) that he would have earned had he not been required to be on jury duty.  An employee

summoned to jury duty must work his complete or any part of his regularly scheduled duties, as

determined by the Company, to the extent reasonably possible given his jury duty schedule.  If an

employee is summoned to jury duty, he shall supply the Company a copy of such summons as soon

as he receives it so the Company may cover the employee's shift if necessary, and shall supply the Company certification of jury duty served and jury duty pay received.

**Section 10.    Tuition Reimbursement**

The Company and the Union recognize the need for highly qualified employees in the Energy Services Technician Classification.  As a result, the Company will provide a tuition reimbursement program for all employees.

To be covered under the program all courses must be directly work related and approved by management.  Tuition, fees and books will be paid by the employee at the start of a course.  Upon successful completion, the Company will reimburse the employee in full.

The Company will grant an interest free loan which will be made available at the start of the course to assist employees.  Repayment of the loan will be required only in the event the employee fails or does not complete the course.

Tuition reimbursement payments may be taxable in accordance with IRS regulations in effect at the time the course is completed.

Management will not unreasonably deny requests under this program.

# ARTICLE VII

## SENIORITY, LAYOFF AND RECALL

**Section 1.      Seniority**

All new employees shall be hired on a probationary basis for a nine (9) month period. During this period such employees may be dismissed without recourse to the grievance and arbitration procedure outlined in Article IX.  In addition, during this period, Energy Services Technicians must pass the Company technical examination.

Upon completion of the probationary period the employee's seniority date shall be retroactive to his date of hire.

Seniority shall be broken and the employment relationship deemed terminated by:

(a)    Resignation

(b)    Discharge for just cause

(c)    Eighteen (18) months of continuous absence caused by any reason including layoff, sickness, accident, disability or injury.

(d)    Absence without notice to the Company for three consecutive workdays unless such notice cannot be given due to circumstances beyond the employee's control.

**Section 2.    Layoff and Recall**

Energy Services Assistants will be laid off before Energy Services Technicians or Energy Services Installers.  For purposes of layoff and recall, Company seniority shall be determinative with the least senior employee being laid off first and the most senior employee on layoff being recalled first, provided the employees remaining or recalled have the ability and qualifications as determined by the Company to perform the available work.  Energy Services Installers, if force reduced, may bump into the Service Department only if they have the ability and qualifications to perform service work.  They must pass the Company's Energy Services Technician qualification test to be considered qualified.

Energy Services Technicians, if force reduced, may bump into the Installation Department as Energy Services Installers only if they have the ability and qualifications to perform installation work. If an Energy Services Technician is force reduced to the Installation Department to work as an Energy Services Assistant, then his rate of pay will be reduced to Pay Level 6 Step 1 of the Energy Services Technician wage rate, regardless of the number or types of licenses held.  If upgraded to do service work or work as a lead installer, his rate of pay while doing this work will be increased to his previous technician's rate of pay.  If continuously upgraded for a period of six (6) months, then his wage rate will be readjusted to his previous technician rate of pay.

Should an employee be laid off and subsequently recalled within eighteen (18) months, the period of absence will be disregarded for the purpose of seniority.

# ARTICLE VIII

## RATES OF PAY, WORK WEEK AND CALL OUT

**Section 1.    Rates of Pay**

(a)    The rates of pay for each job classification shall be as listed on Schedule A hereto attached.

(b)    The Company reserves the right to hire employees at any wage level within the Energy Services Technician, Energy Services Installation Technician and Energy Services Assistant classifications.

(c)    The number of employees in each job classification shall be based on Company needs as determined solely by the Company.

(d)    *Shift Differential:* Employees scheduled for shifts starting between 12 Noon and 4:59 a.m. will have added to their regular hourly rates a premium of $1.15 per hour.  Effective March 1, 2002, this premium will increase to $1.30 per hour and effective February 28, 2003 to $1.45 per hour.

(e)    *Overtime:* An employee who is scheduled to work a five (5) day per week, eight (8) hour per day work week shall be credited with overtime for all work in excess of eight (8) consecutive hours (exclusive of scheduled mealtime) in any one (1) day. An employee who is scheduled to work a four (4) day per week, ten (10) hour per day work week shall be credited with overtime for all work in excess of ten (10) consecutive hours (exclusive of scheduled mealtime) in any one (1) day.

(f)    *Sunday Premium:* A premium of twenty-five percent (25%) shall be paid for straight time worked on Sunday.  An employee entitled to overtime compensation for Sunday work shall not be eligible for such premium, it being understood that the payment of such premium is limited to straight time worked.

(g)    *On-Call:* Effective March 2, 2001, employees assigned to on-call assignment will receive thirty-seven dollars ($37) for each day of assignment which will be reduced to seven dollars

10

($7) if the employees receive at least three (3) hours of overtime pay while on on-call for that day. Effective March 1, 2002, these rates will be increased to thirty-nine dollars ($39) and nine dollars ($9) respectively. Effective February 28, 2003, these rates will increase to forty-one dollars ($41) and eleven dollars ($11). It is understood that there is no defined on-call season. The Company's decision to use on-call and/or shift coverage will be based upon workload conditions.

**Section 2.    Work Week and Call Out**

(a)    The normal work week for employees of the Company shall consist of forty (40) hours, being five (5) days of eight (8) hours each or four (4) days of ten (10) hours each.

(b)    In the event a change is made to an employee's work schedule or reporting location, unless prevented by unusual circumstances, forty-eight (48) hours notice of any change will be given. Employees assigned to work a winter shift will be given five (5) days notice prior to the start of and the end of their shift assignment.

(c)    The employees subject to this agreement shall be paid a minimum of three (3) hours pay at one and one-half (1 ½) times their straight time rate of pay, or overtime pay for actual hours worked, whichever is greater, for each time called out during unscheduled hours. However, should he be called out prior to his regular time for reporting to work he shall be paid overtime for the time worked prior to his regular starting time.

(d)    In any 24-hour period, an employee who has worked more than sixteen (16) consecutive hours shall be entitled to eight (8) hours off, except in cases of emergencies. If such eight (8) hours extends into the employee's normal work schedule, the employee will suffer no loss of pay. Without exception, if an employee is required to work during his rest-time, which falls within his normal schedule, he shall be paid at one and one-half (1 ½) times his regular rate of pay for those hours worked.

# ARTICLE IX

## DISPUTE PROCEDURES

Any grievance which may arise based on a dispute as to the meaning and application of this Agreement shall be finally settled in the following manner:

Step 1. The grievance shall be discussed by the aggrieved employee, his shop steward or his acting shop steward and his first-line supervisor not covered by this Agreement. If not settled in this step, the grievance shall be referred to Step 2.

Step 2. The grievance shall be reduced to writing, signed by the aggrieved employee and forwarded by the Recording Secretary of the local Union to the manager of the department. A meeting shall then be held to discuss the grievance. Present at the meeting shall be the aggrieved employee, his shop steward, a member of the Local Union Committee, a Union Representative from the International, the first line supervisor, the department manager, and the appropriate Company officer. If not settled at this step, the grievance shall be referred to Mediation. The Mediation step is required unless either a Company officer or a Union Representative from the International request in writing that Mediation be bypassed.

Mediation - The Mediation Panel will be composed of a Union representative, a Company representative, and a neutral Umpire. If unable to agree on the selection of the Umpire he shall be appointed in accordance with the Voluntary Arbitration Rules of the American Arbitration Association. No issue in mediation shall be referred to arbitration until the neutral Umpire and one other panel member certify they have failed to resolve the matter satisfactorily.

Arbitration – The grievance may be referred to Arbitration upon written request by either the Company or the Union, delivered by the requesting party to the other within a reasonable time following (a) Step 2, or (b) Mediation, if the matter has been heard in Mediation. The Arbitration shall be conducted by a three-member Board of Arbitration composed of a Union representative, a Company representative, and a neutral Umpire. If unable to agree on the selection of the Umpire,

12

he shall be appointed in accordance with the Voluntary Arbitration Rules of the American Arbitration Association. The Arbitrators shall have no power to add to or subtract from or modify the terms of this agreement. The Arbitration Panel shall announce their decision or resolution as speedily as possible in writing, and it shall be binding upon the parties. The parties shall bear their own costs of mediation and arbitration. The neutral Umpire's fee will be split equally between the Union and the Company.

## ARTICLE X

### MISCELLANEOUS

(a)    Neither the Company nor the Union shall unlawfully discriminate against any employee with respect to any aspect of the employment relationship in accordance with all applicable federal, state and local laws regarding employment discrimination.

(b)    The use of the masculine or feminine gender in this Agreement shall be construed as including both genders and not as restrictions on the basis of sex unless the contract clearly requires a different language construction.

(c)    It is agreed that the provisions, if any, contained in this agreement, which are in conflict with the provisions of any Federal or State Labor Laws shall not be enforceable.

(d)    With the exception of the following Sidebar Agreements that continue to remain in effect at the time of this agreement and are identified herein, this Agreement sets forth the entire understanding of the parties with respect to the matter contained herein and may not be modified in any respect except in writing signed by both parties.

    HVAC agreement
    ESA promotion
    1st job assignment at beginning of shift
    Installation inspections
    Calling for an assist
    Commission payments for dedicated installers
    Change of season truck clean-up time
    Truck maintenance scheduling
    Holiday assignments

(e)    Upon written request by the Union, an employee will be granted a leave of absence without pay to perform full-time official duties on behalf of the Union. Such leave of absence shall be for a period of up to eighteen (18) months. Such employee will continue to accrue seniority and be entitled to all benefits upon his return to work.

(f)    The Company shall supply all employees with uniforms. Effective March 2, 2001, the uniform allowance will be two hundred seventy-five dollars ($275), effective March 1, 2002, two hundred ninety dollars ($290) and effective February 28, 2003, three hundred five dollars ($305). The care and maintenance of such uniforms is the responsibility of each employee. Effective March 2, 2001, a ninety dollar ($90) safety shoe allowance will be provided which will increase to ninety-five dollars ($95) effective March 1, 2002 and to one hundred dollars ($100) effective February 28, 2003.

(g)    Upon the discretion of an employee's manager, compensation for travel time may be awarded to an employee if said manager determines the travel time to a particular job assignment warrants such compensation. It being understood that the authority and responsibility for determining the amount of compensation to be paid for such travel time rest solely with the employee's manager.

# ARTICLE XI

## SUCCESSION LANGUAGE

Agreement made and entered into this 1st day of March 2001 by and between KeySpan, its successors and/or assigns (hereinafter called the "Company") and the United Steelworkers of America, AFL-CIO-CLC, for and in behalf of its Local Union #9432, United Steelworkers of America, AFL-CIO-CLC (hereinafter called the "Union"), shall be binding on their successors and/or assigns.

# ARTICLE XII

## CHANGES IN JOBS

During the life of this Agreement, in the event a new bargaining unit job is established or substantial change is made in the duties of an existing bargaining unit job, the rate of the new or changed job shall be established by the Company with due regard for the content of the new or changed job and the rates paid for comparable work to other employees of the Company. Following mutual discussion between the Company and the Union, if the Union disagrees with the rate as determined by the Company, the question of what the new rate should be in accordance with the foregoing shall be subject to the grievance and arbitration procedure.

# ARTICLE XIII

## SAFETY COMMITTEE

The Company shall establish a Joint Safety Committee consisting of three (3) Union representatives appointed by the Union President and three (3) representatives of the Company who shall meet each month to discuss matters pertaining to safety.

# ARTICLE XIV

## DURATION OF AGREEMENT

This agreement shall be, and remain, in full force and in effect through February 29, 2004, and, thereafter, for successive one-year periods, unless one of the parties hereto on or before the sixtieth day (60) next preceding February 28 of any year, shall notify the other party hereto in writing of its desire to modify or terminate the same.

In witness whereof the parties hereto caused this Agreement to be signed and their seals to be hereto affixed by their duly authorized officers as of the day and year below written.

## SCHEDULE A

| JOB CODE | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 | Level 6 |
|---|---|---|---|---|---|---|
| **01 Energy Services Technician/Installer** | | | | | | |
| Step 1 | $23.510 *24.942* | $23.283 *24.701* | $23.057 *24.461* | $22.660 *24.040* | $22.145 *23.464* | $20.600 *21.865* |
| Step 2 | | | | | | $18.540 *19.670* |
| Step 3 | | | | | | $16.480 *17.484* |
| **02 Energy Services Assistant** | | | | | | |
| Step 1 | $12.360 | $10.300 | | | | |

(a) The employee's record will be reviewed when an employee is eligible for a level increase to determine that the employee's progress and qualifications are satisfactory to grant such a level increase.

(b) The Company may hire employees at any level within the wage matrix.

(c) The Company has full use of the license.

(d) EPA certification requires 1 year of experience.

(e) The Company determines the number of employees in each classification only for ESA versus EST

(f) To qualify as an Energy Services Technician the employee must pass the Company Energy Services Technician test.

(g) ESA's promoted to the EST or ESI classification will be paid at the Level 6 Step 3 wage rate unless the Company determines a higher rate is appropriate. After 1 year in the EST or ESI classification, the ESA will receive a pay increase to the highest wage level his license(s) qualifies him for if his progress and qualifications are satisfactory.

## Wage Increases

Effective March 1, 2002, the above rates shall be increased 3%.
Effective February 28, 2003, the 2002 rates shall be increased 3%.

## Installation Department Adjustment

Effective March 2, 2001 a 0.35/Hr. wage adjustment will be given to Energy Services Installers, Electricians and Energy Services Assistants in the Installation Department along with the Energy Services Technicians assigned to the Water Heater trucks. This 0.35/Hr. wage adjustment will also be given to Energy Services Technicians in the Service Department performing a central system heating or air conditioning installation.

17

**SCHEDULE A**
**-continued-**

### Energy Services Technician/Installer

**Level 1:**  Must be a Massachusetts Master or Journeyman Plumber and a Massachusetts Contractor or Journeyman HVAC/R technician and have an EPA Universal or Type II certification.

**Level 2:**  Must be a Massachusetts Master or Journeyman Plumber and have an EPA Universal or Type II certification or be a Massachusetts Master or Journeyman Plumber and Electrician.

**Level 3:**  Must be a Massachusetts Master or Journeyman Gas Fitter and have an EPA Universal or Type II certification or be a Massachusetts Master or Journeyman Electrician and have an EPA Universal or Type II certification or be a Massachusetts Master or Journeymen Gas Fitter and Electrician.

**Level 4:**  Must be a Massachusetts Master or Journeyman Plumber or Electrician or a Massachusetts Contractor or Journeyman HVAC/R technician.

**Level 5:**  Must have an EPA Universal or Type II certification with 1 year of experience.

**Level 6:**

Step 3   Must immediately enroll in a Massachusetts Plumbers Apprentice program, HVAC Certification Program, Gas Fitter Apprentice Program, Oil Burner Technician Program or Electrician Apprentice Program.

Step 2   Must have a minimum of twelve months in Step 3, be working towards a Massachusetts Journeyman's Plumber License, HVAC Certification, Journeyman's Gas Fitter License, Oil Burner Technician License or Electrician license.

Step 1   Must have a minimum of twelve months in Step 2 and have a valid HVAC Certification, Journeyman's Gas Fitter License, Oil Burner Technician License, Electrician License or pass the Massachusetts Journeyman Plumber's Examination.

### Energy Services Assistant:

**Level 1:**  Must be a Massachusetts Master or Journeyman Plumber, Gas Fitter, Electrician or Massachusetts Contractor or Journeyman HVAC/R technician or have a EPA Universal or Type II certification with 1 year of experience

## SCHEDULE B

## Commission and Referral Program

✓ One of the premises when the business was established is that everyone in the company would sell products and services.  To that end, a commission plan was established that paid on the following schedule:

**Base Plan**

| Product | Commission |
|---|---|
| Service Contract | $6.00 |
| Water Heater add-on | $2.00 |
| Tune-up | $3.00 |
| Water heater install | $5.00 |
| Central System Install | $30.00 |
| Fireplace Ins, Logs & Rm Htr | $20.00 |

✓ This schedule does not take into account when a "Referral" is made.
✓ The schedule below will pay for two distinct activities and will directly reflect the level of involvement by an employee.

| Product | Commission for Sale | Commission for Referral |
|---|---|---|
| Service Contract | After 20 Units $ 10.00 | $3.00 |
| Tune- up | After 10 Units $  4.00 | $1.50 |
| Water Heater Install | After 6   Units $ 10.00 | $3.50 |
| Central System Install | After 3   Units $ 60.00 | $15.00 |
| Fp Ins, Logs, & Rm Htr | After 5   Units $ 40.00 | $10.00 |

✓ A Referral is defined as one employee giving contact information to another Company employee and that person then takes the sale to completion.  This would occur when a customer purchases a service contract (w/ water heater add on) or tune-up within 2 weeks of an EST's visit or the in the case of Associations, or other groups contacting the marketing department.  The referral on a water heater install would require contacting a designated office employee with customer information.  For a central system install, it would require contacting the salesperson, Inside Sales Coordinator or the Install Manager on-call and providing them with pertinent system information.

✓ A sale would be defined as obtaining a signature on a contract or proposal for the purchase of one of the Company's services.

<u>SCHEDULE C</u>

### Gain Sharing Program - $1,000

## Funding Mechanism: Gross Margin Target of 23% of Total Revenue

The Company must achieve at least 85% of its Gross Margin Target for a pro-rated payout of the <u>Company Performance Award</u>. Performance exceeding the Gross Margin Target will be recognized with a pro-rated payout up to a maximum of 150 %.

# Company Performance               40%

    **Customer Satisfaction greater than 95%**     20%
-    Measured by surveys and customer compliments and complaints

    **Overall Company Growth**            20%
-    Total Revenue $23MM = 10%
-    Contract Customers 60,000 = 10%

# Individual Performance            60%
♦  Safety – no preventable safety related accidents =    10%
♦  Average revenue/cost ratio per call – (2 to 1) =     10%
♦  Quality =                                  20%
          - Number of repeat calls – no more than 5%
          - Completeness and timeliness of paperwork
          - Payment collection at job site = 98%
          - Attendance – no more than 2 sick days in 12 months
♦  Customer Satisfaction rating – greater than 95% =    5%
♦  Total individual sales revenue (contracts & installations) –
        at least $25,000                       15%

**Pay-out Method:**
The Company portion of the gain sharing award will be paid to an employee if at least 85% of the gross margin target is achieved <u>and</u> the employee is eligible for 75% of their individual performance payout.

The individual portion of the gain-sharing award will be paid out independent of the Company performance measures and will be based solely on an employee's job performance.

Payouts pro-rated by month (e.g. if worked only 11 months eligible for 11/12ths).

Employees must be hired by Sept 30th of the calendar year being measured to be eligible.

Payouts will occur at the end of each contract year in March.

## SCHEDULE D

## Establishment of an Installation Department

The Company and Union shall set up an Installation Department consisting of employees who after being polled on an annual basis volunteer for and are committed to this duty for a period of one year. The Company shall establish the number of positions needed and the qualifications required in any department based upon an efficient use of manpower and operational needs. The Company will conduct an annual polling to permit employees to transfer between departments and will further poll to fill vacancies in the Installation Department as they occur.

Selection to the Installation Department will be based on senior qualified. In the event a position is not filled through the polling process, the Company can require the junior qualified by zone to fill the position.

After establishment of the installation department, employees that have successfully bid into the department will be polled first to determine if they want to keep their current assignment. Other than in the case of a layoff or a reduction in force employees wanting to stay in the installation department can not be bumped out by employees from another department that have more company seniority.

An employee's departmental seniority shall begin to accrue from the first date the employee volunteers for and is awarded the position. An employee that successfully bids into a department that he was initially required to enter will have his departmental seniority credited retroactively back to the first date of continuous assignment. Employees required to move into another department will retain their prior departmental seniority. Employees will lose their departmental seniority if they voluntarily leave a department.

## SCHEDULE E

### Establishment and Use of Installation Overflow List

The Company and Union shall set up an overflow list consisting of employees who after being polled on an annual basis volunteer for and are committed to this duty for a period of one year. The Company shall select employees on the overflow list after it has determined that either the current quantity of work can not be performed by the existing members of the Installation department or based upon efficiency and operational needs staffing from the overflow list is more appropriate.

The Company shall establish the number of positions needed in any department based upon an efficient use of manpower and operational needs.

Work assignments from the overflow list will be made based on the senior employee qualified to do the work and by work zone. If no one volunteers from the overflow list, the junior qualified employee on the list shall be required to take the assignment.

In the event, the workload can not be handled by the Installation Department and the employees on the overflow list; the Company shall solicit qualified volunteers from the remainder of the work force. In the event this does not satisfy manning needs, the Company shall require a qualified employee from the remaining work force within the group where the job exists, to perform the work.

Once an employee is assigned to a project job, he shall perform this project until its completion.

In the event, an employee with a non-qualifying license volunteers for the overflow list the employee shall be treated as the least senior on the list.

When seeking to fill a position as a second person on the job the Company shall use ESA's instead of first using the overflow list.

## Energy Services Installation Technician

Duties:

- Responsible for assembling, installing, servicing and repairing customer heating, air conditioning and other equipment and their overall operational effectiveness on all field activities for residential and commercial applications.
- Lays out, fabricates, assembles, installs, maintains, repairs all types of piping and piping systems as well as sheet metal systems relating to the installation.
- Install and fabricate any sheet metal, water and gas fittings, duct, chimney and vent pipe along with any and all alterations needed to install it.
- The demolition or removal of existing equipment necessary for the installation of new equipment.
- Cuts openings in walls, floors to accommodate piping and duct work systems using both hand and power tools.
- Perform electrical wiring associated with HVAC replacements.
- Installation of Parts.
- Responsible for performing Licensed Energy Services Technician duties as assigned or required by workload.
- Responsible for communicating with the customer and where possible resolving customer problems.
- Responsible for providing technical support and coordination during the installation, servicing and repairing of equipment.
- Responsible for ensuring customer needs are satisfied in a cost-effective manner without direct supervision.
- Responsible for maintaining vehicle inventory and stock.
- Responsible for maintaining a professional appearance and attitude at all times.
- Responsible for selling and supporting company goals with day to day efforts.

These duties are not meant to be all-inclusive, but represent the typical type of work performed by employees in this classification. The company reserves the right to add, modify or delete duties or responsibilities when appropriate. The company reserves the right to make assignments based on workload, scheduling, efficiency and customer needs.

## Energy Services Technician

Duties:

- Responsible for servicing and repairing customer heating, air conditioning and other equipment used in residential and commercial applications.
- Responsible for the installation of equipment parts.
- Responsible for performing Licensed Energy Installation Technician duties as required by workload or as operational needs and efficiencies require.
- Responsible for communicating with the customer and where possible resolving customer problems.
- Responsible for providing technical support and coordination during the installation, servicing and repairing of equipment.
- Responsible for ensuring customer needs are satisfied in a cost-effective manner without direct supervision.
- Responsible for maintaining vehicle inventory and stock.
- Responsible for maintaining a professional appearance and attitude at all times.
- Responsible for selling and supporting company goals with day to day efforts.

These duties are not meant to be all-inclusive, but represent the typical type of work performed by employees in this classification. The company reserves the right to add, modify or delete duties or responsibilities when appropriate. The company reserves the right to make assignments based on workload, scheduling, efficiency and customer needs.

## <u>Energy Services Assistant</u>

Duties:

- Responsible for assisting in assembling, installing, servicing and repairing customer heating, air conditioning and other equipment used in residential and commercial applications
- Perform work in a higher job classification as directed by the Company

These duties are not meant to be all-inclusive, but represent the typical type of work performed by employees in this classification. The company reserves the right to add, modify or delete duties or responsibilities when appropriate. The company reserves the right to make assignments based on workload, scheduling, efficiency and customer needs.

IN WITNESS WHEREOF, the parties by their duly authorized representative, hereto affix their signatures as of this _____ day of _____, _____.

UNITED STEELWORKERS OF AMERICA, AFL-CIO-CLC

Leo W. Gerard,
International President

James English,
International Secretary-Treasurer

Richard H. Davis,
Vice President, Administration

Leon Lynch,
Vice President, Human Affairs

Louis J. Thomas,
Director, District 4

Stephen J. Finnigan
Staff Representative

Wayne Glassman
President

Scott Padden
Vice PResident

Joseph P. Williams
Negotiating Committee

David Clemente
Negotiating Committee

Mark Vigeant
Negotiating Committee

FOR THE COMPANY

Francis J. Coleman
President

Kevin N. Caddell
Director Field Operations

**Exhibit 2**

FILL OUT IN TRIPLICATE

# GRIEVANCE REPORT

USWA Local Union No. _9432_     Grievance NO. _____

Location _62 SECOND AVE_ _____     Date _4-25-01_

_BURLINGTON_ _____

| EMPLOYEE'S NAME | IDENTIFICATION NO. | DEPARTMENT | JOB TITLE |
|---|---|---|---|
| JOHN HOGAN | 0025 | SERVICE | TECH |

Use space below to write in other important Grievance information

_____

_____

Nature of Grievance

_UNJUST   TERMINATION_ _____

_____

_____

_____

_____

_____

Settlement requested in Grievance _REINSTATEMENT,  WITH  BACK PAY_

_AND   NO   LOST  TIME_ _____

_____

Agreement Violation _____

Signature of Aggrieved:                          Signature of Union Representative:

_John J. Hogan_                                   _Scott Picke_

_____                  _David Clemente_

_____                  _____

Form USWA 122   [logo]   PRINTED IN U.S.A.

COPY FOR MANAGEMENT

Exhibit 3

## LAST CHANCE AGREEEMENT

John Hogan, United Steelworkers of America, AFL-CIO-CLC Local 9432 (Union), and KeySpan Home Energy Services New England (KHES), have reached agreement on reinstatement of John Hogan with the following conditions:

1.  Mr. Hogan will be placed on a probationary status for a period of 12 months during which time he may be discharged for cause and such discharge will not be subject to the grievance and arbitration procedure as outlined in Article IX of the parties collective bargaining agreement.  Furthermore, as long as Mr. Hogan continues to be an employee of the Company, he may be discharged if found to be using his contacts with customers for personal gain or the gain of others or for engaging in any outside work activity that directly or indirectly competes with the services provided by the Company and such discharge will not be subject to the grievance and arbitration procedure as outlined in Article IX of the parties collective bargaining agreement.

2.  No grievance shall be filed in regards to Mr. Hogan's most recent discipline, which is being reduced from discharge to a 46-day suspension for directly referring installation work to a competitor of the Company.

It is understood that this Agreement is non-precedent setting and shall not be cited in any other grievance or arbitration except as relates to Mr. Hogan.


_____          _____
For KHES                                    John Hogan


_____6 - 18 - 0 1_____                       _____
Date                                         For the Union

Exhibit 4


**KEYSPAN**
Home Energy Services

62 Second Avenue
Burlington, Massachusetts 01803
Tel 781-359-2600
Fax 781-359-2721

December 5, 2001

Mr. John Hogan
20 Swan Avenue
South Weymouth, MA 02190

Dear Mr. Hogan:

I am writing to inform you of my decision to rescind the offer allowing you to resign and based upon irrefutable evidence terminate your employment at KeySpan Home Energy Services New England (KHES) effective December 5, 2001 due to you violating the terms of your Last Chance Agreement with KHES (see enclosed copy). As you are well aware, by your action of directly referring a customer to competitors of KHES you violated the terms of your Last Chance Agreement and have left me no alternative but to terminate you as an employee.

I must tell you I am extremely disappointed with your repeated behavior of using your contacts with KHES customers to refer work to our competition with little regard to the impact that could have on taking work away from this Company and your fellow employees. I find this all the more troubling since you previously promised to stop doing this and signed an agreement stating as much.

Shortly, you will be receiving in the mail from MaryAnne Ryan documentation explaining your termination benefits. You can call her at 781-359-2672 if you have any questions regarding this material.

Sincerely,

Kevin N. Caddell
Kevin N. Caddell
Director of Operations

Encl:   Last Chance Agreement
Cc:     Fran Coleman
        Steve Weglarz
        Scott Padden – Local 9432